# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                            Case No. 04-C-248

JEFFERSON N. CALIMLIM,
ELNORA M. CALIMLIM, and
JEFFERSON M. CALIMLIM,

        Defendants.

---

**RECOMMENDATION AND ORDER RE: DEFENDANTS' PRETRIAL MOTIONS**

---

## I. BACKGROUND

On October 19, 2004, a grand jury sitting in the Eastern District of Wisconsin returned a two count indictment naming Jefferson N. Calimlim ("Jefferson") and his wife, Elnora M. Calimlim ("Elnora") as defendants. Count One charged the defendants with harboring an illegal alien, identified as "I.M.," for the purpose of private financial gain, in violation of 8 U.S.C. §§ 1324(1)(1)(A)(iii) and 1324(a)(1)(B)(i). Count Two charged the defendants with conspiracy to harbor the same alien, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). The indictment also contained a sentencing allegation that the alien was a vulnerable victim, as well as a forfeiture provision pertaining to the Calimlims' home.

On January 4, 2005, the grand jury returned a superseding indictment. With respect to Jefferson and Elnora, the allegations in the superseding indictment remained precisely the same as in the original indictment. However, the superseding indictment added a third defendant, Jefferson

M. Calimlim ("Jefferson, Jr."), as a defendant in both Counts One and Two. Furthermore, the superseding indictment added a third count, in which Jefferson, Jr. is the only named defendant. Count Three of the superseding indictment alleges that on or about September 29, 2004, Jefferson, Jr.

> knowingly and willfully made a false material statement, in that the defendant informed a federal agent that he did not know the whereabouts of "I.M.," and had not seen her for a year when in fact, as he well knew, "I.M." resided at and was present in the same residence as the defendant at the time that he was questioned.

> All in violation of Title 18, United States Code, Section 1001.

(Superseding Indictment, Count Three.)

The defendants were arraigned on the superseding indictment and entered not guilty pleas to the charges. Subsequent to their arraignment on the superseding indictment, the defendants filed several pretrial motions. Those motions are: (1) Jefferson and Elnora's Motion to Dismiss the Superseding Indictment based on abuse of the grand jury process (dkt.#49); (2) Jefferson and Elnora's Motion for Production of Certain Grand Jury Materials (dkt. #41); (3) Jefferson, Elnora and Jefferson, Jr.'s Motions to Suppress Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 28, 2004 (dkt. #47 & 57); (4) Jefferson, Elnora and Jefferson, Jr.'s Motions to Suppress Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 29, 2004 (dkt. #42 & 56); (5) Jefferson, Elnora and Jefferson, Jr.'s Motions to Strike Surplusage (dkt. #43 & 55); (6) Jefferson's Motion to Suppress Statements (dkt. #45); and (7) Jefferson, Jr.'s Motion to Suppress Statements (dkt. #54).

Subsequently, on March 15, 2005, the defendants were named in a second superseding indictment. Counts Four, Five and Six of the second superseding indictment charge the defendants

with essentially the same offenses with which they were charged in the superseding indictment. However, Counts One, Two and Three of the second superseding indictment charge Jefferson and Elnora with new offenses, i.e., violations of 18 U.S.C. §§ 371, 1589 and 1594. The defendants were arraigned on the second superseding indictment and entered pleas of not guilty to the charges. Subsequent to their arraignment on the second superseding indictment, Jefferson and Elnora filed a motion to dismiss. Jefferson and Elnora ask the court to "dismiss Counts Two and Three of the Second Superseding Indictment or, in the alternative, to require the government to elect which of these counts it will proceed on. As grounds, the Calimlims assert that by charging both a completed and an attempted violation of 18 U.S.C. § 1589 in Counts Two and Three, the government impermissibly fractionates a single course of conduct into two distinct offenses." (Defs.' Mot., dkt. #94.)

As stated above, among those motions filed by the defendants after the return of the superseding indictment were (1) a Motion to Dismiss (dkt. #49) and (2) a Motion for Production of Certain Grand Jury Materials (dkt. #41). On March 24, 2005, this court issued its recommendation and order on those two motions, in conjunction with its order on the defendants' motion to quash subpoenas. The instant Recommendation and Order will address those of the defendants' pretrial motions which have not yet been previously addressed.

## II. DISCUSSION

### A. Motion to Suppress Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 28, 2004

The defendants have filed motions to suppress all evidence seized as a result of the execution of a search warrant issued on September 28, 2004. That particular search warrant, which was

3

executed on September 29, 2004, authorized the search of 19120 Still Point Trail, Brookfield, Wisconsin, for "Ms. Erma Martinez, a woman approximately 36 years of age, 5'1" tall, 120 pounds, brown eyes, with black shoulder-length hair . . . believed to reside at the home of Jefferson and Elnora Calimlim at 19120 Still Point Trail, Brookfield, Wisconsin." (Search Warrant, Case No. 04-M-294). According to the defendants, the warrant was issued without probable cause because

> (1) the informant here was not proven to be reliable; (2) the affidavit supporting the search warrant does not effectively support the credibility of the informant; and (3) the information furnished by the informant suggests only innocent-seeming activity and conduct devoid of everything but mere suspicions. The Calimlims further assert that the affidavit supporting the warrant was based solely on the hearsay of an unidentified informant who had never before been used by agents, and who therefore could not be considered credible.

(Defs.' Br. at 1-2, dkt. #48.)[1]

According to the return filed in connection with this search warrant, the only thing "seized" as a result of the execution of the warrant was "[t]he person of Irma Martinez." (Warrant Return.) Presumably, the defendants seek to have suppressed as evidence the fact that Irma Martinez was found on the premises of 19120 Still Point Trail, Brookfield, Wisconsin. Whether the defendants' motions also seek to have Ms. Martinez prohibited from testifying at trial is not clear. Nor is it clear that the defendants would, in any event, be able to seek such relief. Fortunately, it is not necessary to address that thorny issue because, for the reasons set forth below, I am satisfied that the warrant was supported by probable cause.

My duty in reviewing this search warrant is limited. The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

---

[1] In this section, the court cites to the motion and brief filed by Jefferson and Elnora Calimlim. Jefferson, Jr. raises the same objections in his motion and brief (dkt. # 57 & 58).

4

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id*. at 238. Probable cause exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. Lloyd,* 71 F.3d 1256, 1263 (7th Cir. 1995); *United States v. Ellery,* 678 F.2d 674, 677 (7th Cir. 1982); *United States v. Anton,* 633 F.2d 1252, 1254 (7th Cir. 1980). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. McNeese,* 901 F.2d 585, 592 (7th Cir. 1990) (quoting *Ellery*, 678 F.2d at 677.) "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Kimberlin,* 805 F.2d 210, 228 (7th Cir. 1986) (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)).

Probable cause is a fluid concept turning on the assessment of probabilities in a particular factual context. "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). A search warrant may issue even in the absence of direct evidence linking criminal objects to a particular site. *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995). "The [judicial officer] to whom the warrant application is directed 'is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense,' and the [judicial officer] 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" *Id*. (quoting *United Sates v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990)).

5

A judicial preference is to be accorded warrants in those cases where there is a close or marginal showing of probable cause. In reviewing prior probable cause findings made by a judicial officer in issuing a warrant, "great deference" is to be accorded to that determination. *United States v. Leon*, 468 U.S. 897, 914 (1984). The duty of the reviewing court is simply to ensure that the judicial officer issuing the warrant had a substantial basis for concluding that, under the totality of the circumstances, probable cause existed to believe the contraband or evidence of the crime sought will be found in a particular place. *Gates*, 462 U.S. at 236. The Seventh Circuit has held that the standard of review of a determination that probable cause exists supporting issuance of a search warrant is "one of affirmance absent clear error by the issuing magistrate." *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992).

The defendants' argument in support of their motions to suppress is directed at the insufficiency of the information claimed to have been provided by the informant as well as the insufficient showing of informant reliability. The Seventh Circuit has discussed the standard for evaluating informants' tips. "'[I]nformants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.'" *United States v. Rucker*, 138 F.3d 697, 700 (7th Cir. 1998) (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). "The reliability of an informant's information may be shown by the informant's past record of reliability, through independent confirmation or personal observation by the police, or by other methods." *Id.*

> "[F]irst-hand observations [by a CI] support a finding of reliability." *Buckley,* 4 F.3d at 555-56; *see also Gates,* 462 U.S. at 234, 103 S.Ct. at 2330 ("even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first hand, entitles his tip to greater weight than might otherwise be the case."). The degree of detail that an informant provides, as well as the corroboration by an officer's independent investigation of the informant's information, also serve to support a

6

finding of reliability.  *United States v. Pless*, 982 F.2d 1118, 1125 (7th Cir.1992).

*Lloyd*, 71 F.3d at 1263.  In *United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002), the Seventh Circuit stated:

> The court must examine the totality of the circumstances to determine whether the affidavit on its face established probable cause.  Where the affidavit is support by an informant's tip, the totality-of-the -circumstances inquiry encompasses several factors, including: (1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and police officer's application for the search warrant.  The court should also consider whether the informant personally appeared and presented an affidavit or testified before the magistrate, thus allowing the judge to evaluate the informant's knowledge, demeanor, and sincerity.

*Id*. at 866 (citations omitted).  At the same time, the court in *Koerth* made clear that "appellate courts may not uphold a warrant issued based on solely conclusory allegations."  *Id*. at 867.

To begin, the female informant in this case was anonymous.  In other words, law enforcement personnel did not know her identity.  Accordingly, the informant had no track record of dealing with law enforcement personnel, which of course would have provided at least some basis for deeming her to be reliable.  According to the defendants, although the government did corroborate several of the informant's declarations, such as Jefferson N. Calimlim and Elnora Calimlim being licensed physicians and that the Calimlim's home had a wine cellar in the basement, "the government offered no independent corroboration that 'Erma' Martinez was an undocumented alien in its search warrant application.  The government relied on only uncorroborated, unsubstantiated declarations from an unnamed informant to establish that Martinez was an illegal alien and the Calimlims harbored her.  This uncorroborated declaration of the presence of an illegal alien is the only criminal activity on which the search warrant was based."  (Defs.' Br. at 3, dkt. #48.)

7

The defendants further argue that, although efforts were made to deliver mail to "Erma" Martinez, such efforts were unsuccessful. Thus, "the government never established that Martinez actually resided at 19120 Still Point Trail. Despite government surveillance of 19120 Still Point Trail, Martinez was never seen at this residence by any government actor, and Postal Inspector Washington received inconsistent reports when he asked residents of 19120 Still Point Trail if Martinez resided therein." (Defs.' Br. at 4, dkt. #48.)

To be sure, the female informant in this case was anonymous. But, the information given by her appears to be first-hand. According to the affidavit of Special Agent Jeffery A. Stillings, the ICE Law Enforcement Support Center (LESC) received a call from the informant on August 24, 2004. The informant stated that she was a former friend of Jefferson and Elnora Calimlim of 19120 Still Point Road, Brookfield, Wisconsin. According to the informant, the Calimims were prominent doctors in the community. The informant further stated that

> an Erma Martinez has been in the United States illegally for 18 years and is currently living at 19120 Still Point Trail, Brookfield, Wisconsin. . . . Erma Martinez has been a housekeeper/servant for the Calimlim family with the false hope that they will sponsor her for a permanent resident alien card. . . . [T]he Calimlims have no intention of filing the necessary immigration paperwork for Martinez [and] that Martinez came to the United States at the age of 18 and her main responsibility is to take care of the children in the Calimlim household.

(Stillings Aff. at ¶¶ 6-7, Case No. 04-M-294)

Stillings affidavit further avers as follows:

> 8. The caller stated that Martinez is currently living in the basement in a wine cellar at the Calimlim house, which is used as a bedroom. The caller states that Martinez is paid cash under the table by the Calimlims. The caller states that Martinez forwards monies to her family overseas and is not allowed to socialize in public.

> 9. The caller stated that Martinez is locked in the basement of the Calimlim house

8

and is only let out for the purpose of cleaning, caring for the children, cooking, laundry, walking the family's dog, or occasional visits to the church.

10.   The caller stated that she was a friend of the Calimlims and severed all ties with them after seeing how they treated Martinez.

11.   The caller provided the names of Jefferson and Elnora Calimlim and the address of 19120 Still Point Trail, Brookfield, WI as the owners of the house and employers of Martinez.  The caller described Martinez as 5'1" tall, 120 pounds, brown eyes, and black shoulder-length hair.

12.   The caller then broke down and cried on the phone.  The caller requested that the Department of Immigration follow up on this tip as soon as possible for the benefit of Martinez's welfare.  The caller stated that no one should live under those conditions, that it is just not humane and hopes that Immigration will approach the situation very carefully because the Calimlim family is the only people Martinez knows.

(Stillings Aff. ¶¶ 8-12.)  As previously stated, the information provided by the informant certainly appears to be first-hand.  Moreover, it is far from conclusory in nature.  The informant provides a detailed description of Ms. Martinez.  She also describes in some detail the interior of the Calimlims' house, more particularly that there is a wine cellar and that is where Ms. Martinez has her sleeping quarters.[2]  Indeed, her explanation of why she was reporting the information (that she used to be a friend of the Calimlims, but severed all ties with them once she saw how they treated Ms. Martinez) lends a certain credibility to the informant that would not be attendant to someone who merely called to report something they had seen being performed by unknown individuals.  Indeed, that she cried while on the phone provides further indication that she was telling the truth about what she had seen in the Calimlim home.

But, the government did not place exclusive reliance on the information provided by the

---

[2] That there was such a wine cellar was confirmed when law enforcement officers reviewed the blueprint copies of the floor plan on file with the Brookfield, Wisconsin Assessor's Office for 19120 Still Point Trail.  *See* Stillings Aff. ¶ 18.

9

informant and run immediately to a judge to obtain a search warrant. Instead, efforts were made to

ascertain whether there indeed was a person residing at the Still Point residence by the name of Erma

Martinez. In that regard law enforcement agents attempted to deliver a "certified" mail package to

her. Although such delivery was not successfully accomplished, Stillings' affidavit certainly

indicates good reason to believe that there was an "Erma Martinez" living at the residence. His

affidavit reads as follows:

> 16. On September 16, 2004, at approximately 1:50 PM, Postal Inspector Washington attempted to deliver the package to Martinez at 19120 Still Point Trail, Brookfield, WI. At the time, Postal Inspector Washington was dressed in his Letter Carrier uniform, and drove to the residence in a United States Postal Service vehicle. I maintained surveillance of the delivery from a distance. Postal Inspector Washington approached the door, knocked, and was met by a male in his mid-twenties, believed to be one of the Calimlim children. Postal Inspector Washington advised the male that he had a certified package for Erma Martinez and that she needed to sign for it. Postal Inspector Washington advised me that the male became noticeably nervous, looking around and hesitating before answering him. The male told the Postal Inspector that Erma Martinez was not home at the time and that she would return later. The male asked if he could take the package for her. Postal Inspector Washington told him that she needed to sign for it personally and that he would attempt delivery again the following day.
>
> 17. On September 17, 2004 at approximately 1:30 p.m., Postal Inspector Washington attempted a second delivery of the certified mail package to Erma Martinez at 19120 Still Point Trail, Brookfield, WI. Again dressed in Postal Service uniform and driving a Postal Service vehicle, Postal Inspector Washington knocked on the door and was again greeted by the same young male. This time the male stated tht Erma Martinez no longer lived there, but that he would be happy to deliver the package to her if they would leave it with him. Postal Inspector Washington stated that the male again appeared nervous and made several inquiries as to the sender of the package and the contents of the package. Postal Inspector Washington then left the residence without delivering the package.

(Stillings Aff. ¶¶ 16-17.) The above scenario makes clear that (1) on September 16, 2004 Erma

Martinez lived at the Still Point address, and (2) by the next day she had moved out or, more likely,

those with whom she lived at the Still Point Trail address wanted the postman to believe that she had

10

done so. The bottom line is that as of September 17, 2004, law enforcement authorities had not only confirmed that there was an Erma Martinez associated with the Still Point Trail address, but also that her presence there was of some concern to the other residents.

But what about her status as an illegal alien? The defendants argue that there is insufficient information set forth to demonstrate probable cause to believe that Ms. Martinez was in this country illegally. To be sure, the affidavit does not affirmatively assert that documentary evidence exists to show that Ms. Martinez was in this country illegally. But how could there be such evidence? After all, that's the point; she was allegedly an <u>undocumented</u> alien. Nevertheless, the affidavit sets forth efforts made by Stillings to ascertain whether he could find any information which might shed light on her immigration status. In that regard, Stillings avers as follows:

> In an effort to locate and identify Martinez, I conducted a name search in DHS's Central Index System (CIS), a database with the names of criminal aliens, naturalized citizens, and permanent resident aliens. I did not find an Erma Martinez that fit the description provided by the anonymous caller. CIS identified four women named Erma Martinez. None of [the] women named Erma Martinez are located in Wisconsin.

(Stillins Aff. ¶ 3.)

As previously stated, the Seventh Circuit has held that the standard of review of a determination that probable cause exists supporting issuance of a search warrant is "one of affirmance absent clear error by the issuing magistrate." *Pless*, 982 F.2d at 1124. And, in my opinion, Magistrate Judge Gorence did <u>not</u> clearly err by issuing the search warrant on September 28, 2004. Even more to the point, the search warrant issued by Magistrate Judge Gorence on September 28, 2004, was, in my independent opinion, supported by probable cause. Thus, it is recommended that the defendants' motions to suppress evidence seized pursuant to the execution of

11

a search warrant issued on September 28, 2004, be denied.

**B.  Motion to Suppress  Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 29, 2004**

The defendants have filed a motion to suppress all evidence seized as a result of the execution of a search warrant issued on September 29, 2004.  That particular search warrant, which was executed on September 30, 2004, authorized the search of 19120 Still Point Trail, Brookfield, Wisconsin, for the following items:

1.    Documents, forms and records relating to [Erma] Martinez's alienage and immigration status, including but not limited to passports, visas, birth certificates, certificates of naturalization;

2.    Any handwritten notes by Martinez;

3.    Financial records in the name of Martinez or held in guardianship for her;

4.    Documents, forms and records establishing Martinez's residence;

5.    Personal items consistent with Martinez's extended stay at residence;

6.    Documents, forms and records relating to Martinez's employment status, including but not limited to W-2's, W-3's, I-9's, tax documents;

7.   Financial records that may show payments consistent with employment or wages;

8.    Phone records for long distance and international calls;

9.   Financial records and supporting documents relating to overseas payments using wire transfers and alternative methods that are related to Martinez or her family; and

10.    Any correspondence, mailings, notes, or email messages concerning Martinez or her family; and

11.    Personal computers.

(Search Warrant, Case No. 04-M-295.)  According to the defendants, "the warrant fails to describe with sufficient particularity the things to be seized" and, "to the extent that the warrant provided

12

guidance to the agents with respect to the items to be seized, the agents violated the scope of the warrant by seizing documents they were not authorized to seize, and searching the computers beyond the parameters set out in the warrant." (Defs.' Mot. ¶¶ 4-5, dkt. #42.) (Jefferson, Jr. raises the same arguments in his motion, dkt. #56.)

## 1. Sufficient Particularity

According to the defendants' motions, the warrant was overbroad for three reasons. First, "the warrant authorizes the seizure and search of ten categories of documents as well as personal computers, but places no time limitation on the documents that fall within the scope of the warrant." (Defs.' Reply at 4, dkt. #64.) Although Stillings' affidavit avers that Martinez came to the United States and began working for the Calimlims in 1985, "[t]he warrant does not limit the scope of the documents to those documents pertaining to the years 1985 to the present. . . . [T]he warrant should have been limited to records from 1985 to the present." (Defs.' Reply at 5, dkt. # 64.)

Second, "[t]he probable cause showing in the affidavit only supports the seizure of financial records pertaining to the payment of wages to Martinez, and calls to and from the Phillippines, which was Martinez's country of origin. By failing to limit document categories seven and eight to matters involving Martinez, the warrant was overbroad . . . ." (Defs' Reply at 5, dkt. #64.)

Third,

the warrant provides no meaningful limitation on the parameters of the search of the nine computers seized from the residence. . . . The defects in the warrant with respect to the documents to be seized, already noted, apply equally to the computers because the agents were to "avoid searching files, documents or other electronically stored information that is not identified in the warrant."

Additionally, the computer portion of the warrant could have been more narrowly tailored to limit the methodology by which the agents could search the computers. . . .

13

The problem with the warrant in this case is that it provides that "the search procedure . . . *may include, for example*, any or all of the following techniques" (listing five different methodologies by which the agents may search the computers, but not limiting the agents to those techniques ) (emphasis added).

. . . .

In the present case, the Magistrate Judge did not determine the conditions and limitations for inspecting large quantities of computer data. Rather, the Magistrate Judge made suggestions as to how the computers should be searched, but ultimately delegated all discretion in that regard to the agents. The only specific limitation placed on the agents was a prohibition against opening unopened e-mail.

Nine computers are capable of containing millions of documents. It was not unreasonable for the Magistrate Judge to more particularly dictate and limit how those computers could be searched, nor was it unreasonable for the agents, once discovering and seizing nine computers, to obtain a second search warrant describing exactly how they wished the forensic examinations to proceed. By completely delegating this function to the agents, the warrant that was issued on September 29, 2004 failed to provide any meaningful limitation on these forensic examinations and consequently was overbroad.

(Defs.' Reply at 5-8, dkt. #64.)

As discussed below, the defendants also attack the manner in which the search warrant was executed, arguing that the agents did not confine the search to the dictates of the warrant. An evidentiary hearing was conducted on that issue. Subsequent to that hearing the parties were afforded an opportunity to file written arguments in support of their respective positions on that issue. In their opening brief the defendants asserted that they were no longer challenging the particularity of the warrant, i.e. that they were no longer arguing that the warrant was overbroad. Accordingly, this court is not required to consider and issue a recommendation on that issue. Nevertheless, the court will address that issue, as it might, at a minimum, provide some background to the "mode of execution" question.

Under the Fourth Amendment, search warrants are required to describe with particularity the

14

things to be seized. *United States v. Leon*, 468 U.S. 897, 923 (1984). This particularity requirement protects persona against the government's indiscriminate rummaging through their property. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "Although the fourth amendment requires that a search warrant describe the objects of the search with reasonable specificity, it need not be elaborately detailed." *United States v. Jones*, 54 F.3d 1285, 1290 (7th Cir. 1995) (quoting *United States v. Somers*, 950 F.2d 1279, 1285 (7th Cir. 1991)). The warrant need not enable authorities "to minutely identify each item for which they are searching." *United States v. Shoffner*, 826 F.2d 619, 630 (7th Cir. 1987).

A description in a warrant is valid "if it is as specific as the circumstances and the nature of the activity under investigation permit." *Id*. How detailed the warrant must be follows directly from the nature of the items there is probable cause to seize — detail is necessary only to the extent the judicial officer must limit the search and seizure to those items. *United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir. 1987). "The level of specificity must be such . . . that the officers executing the warrant are 'able to identify the things to be seized with reasonable certainty.'" *United States v. Sleet*, 54 F.3d 303, 307 n.1 (7th Cir. 1995) (quoting *United States v. Spears*, 965 F.2d 262, 277 (7th Cir. 1992)). Stated another way, the inquiry is whether an officer executing the warrant would reasonably know what items are to be seized. *United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998). That having been said, "[i]f detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." *Id*.

After applying the above-stated principles to the warrant in question, I am satisfied that the warrant issued on September 29, 2004, is not overbroad. To be sure, the warrant does not limit the documents to be seized to those from 1985 to the present. But so what? Even though Stillings'

15

information was that Martinez had been employed by the Mendozas/Calimlims since 1985, this is not to say that there wouldn't have been documents in the residence concerning Martinez from prior to 1985. After all, it is not likely that Martinez merely dropped by the residence of Dr. Mendoza unannounced in 1985. Indeed, it is not unreasonable to believe that there could, for example, be correspondence of some sort from prior to 1985 regarding her anticipated arrival in the United States.

Second, it is correct to say that categories seven and eight in the "Items to be Seized" attachment do not expressly limit seizure of "[f]inancial records that may show payments consistent with employment or wages" and "[p]hone records for long distance and international calls" to payment of wages to Martinez, and calls to and from the Phillippines, respectively. However, a common sense reading of the warrant would lead a reasonable person to conclude that it was "financial records that may show payments consistent with employment or wages" as relating to Martinez that the issuing judicial officer was authorizing to be seized. This is because the immediately preceding paragraph authorizes the seizure of "[d]ocuments, forms and records relating to Martinez's employment status." Moreover, that the warrant authorized the seizure of phone records for all "long distance and international calls" does not render it overbroad. Indeed, Stillings' affidavit states, inter alia, that

> Martinez was told by the Calimlims that her money is sent to the Phillippines through a hawala money transfer system. Hawala is an underground money transfer based on word of mouth and friendships, not a formalized banking network. Martinez's money is transferred to an undisclosed account that she does not have access to.

(Stillings Aff. ¶ 7.) Given that Martinez had no idea where her money was purportedly being sent and given that "hawala" is an "underground money transfer," it was certainly not unreasonable for the warrant to call for the seizure of all "long distance and international calls." After all, there is no

16

indication that the "hawala" only involved those in the Phillipines. It could very well have involved persons in other parts of the United States as well as in countries other than the Phillipines. Thus, tracking "long distance and international" telephonic contacts between the Calimlim household and others was certainly a reasonable step to take in investigating the Calimlims' alleged harboring of Martinez.

Finally, the defendants initially challenged the magistrate judge's directed procedure for reviewing the contents of the seized computers for those records listed in the warrant as "Items to be Seized." Specifically, they argued that Magistrate Judge Gorence was not particular enough in her directions to the agents with respect to how they should conduct their search of the computers' contents. I disagree. To be sure, Judge Gorence gave examples of techniques that the agents might employ in searching the contents of the computers for the listed items. But, regardless of what technique was employed, she was quite clear in ordering that the agents "shall make reasonable efforts to use computer search methodologies that avoid searching files, documents or other electronically stored information that is not identified in the warrant." (Search Warrant) Indeed, the difficulties to be encountered by agents conducting a document search are always extant, whether the search is conducted in a warehouse full of files or in a computer. In my opinion, Judge Gorence's clear directive, with suggested techniques for executing that directive, was a reasonable means of balancing the defendants' right to not have their computers rummaged through indiscriminately with the government's right to search for the documents/information for which a search warrant had been obtained.

In conclusion, and for all of the foregoing reasons, the search warrant issued on September 29, 2004, was sufficiently particular to survive Fourth Amendment scrutiny. Thus, to the extent the

17

defendants' motions to suppress are (or were previously) predicated on the proposition that the warrant was insufficiently particular, it will be recommended that their motions to suppress be denied.

## 2. Violation of the Scope of the Warrant

The defendants further argue that "[i]f the Court finds that the warrant was not overbroad, in whole or in part, . . . it was [nevertheless] executed in a manner that violated its terms." (Defs.' Reply at 8, dkt. #64.) They requested an evidentiary hearing during which they claimed to be prepared to show the following in support of their motion:

> The agents seized over 4,500 pages of documents from the Calimlim's home.
>
> These documents include records which are not covered by the search warrant, such as personal and corporate tax returns, personal financial records and statements having nothing to do with Erma Martinez, bank records having nothing to do with Erma Martinez, phone records which do not pertain to international and long distance calls, personal correspondence having nothing to do with Erma Martinez, and First Amendment protected materials having nothing to do with Erma Martinez, such as adult video tapes.
>
> In the computer searches, the agents located 999 e-mails, all of which appeared to be related to Dr. Jefferson Calimlim's business pertaining to the recruitment and employment of foreign nurses in the United States. This business is legal and has nothing to do with Erma Martinez.
>
> The agents located and viewed materials covered by the physician-patient privilege (Jefferson N. and Elnora Calimlim are physicians), which have nothing to do with Erma Martinez.
>
> The agents located and copied internet sites that have nothing to do with Erma Martinez.

(Defs.' Reply at 9-10, dkt. #64.)

In *Russell v. Harms*, 397 F.3d 458 (7th Cir. 2005), the Seventh Circuit Court of Appeals stated:

18

An officer executing a search warrant may seize: (i) items named in the warrant; and (ii) evidence that, although not described in the warrant, is subject to seizure under the plain view doctrine. *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992). The plain view doctrine applies "if the officer has a legal right to be in the place from where he sees the object subject to seizure[,] a 'lawful right of access to the object itself,' and if the object's incriminating nature is 'immediately apparent.'" *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991)). The incriminating nature of an object is "immediately apparent" if, under the circumstances, the officer has "probable cause to believe that the item is linked to criminal activity." *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997).

*Id*. at 465. If agents in fact seize items that were neither identified in the warrant nor were subject to seizure under the plain view doctrine, the general rule is that such items (and only those items) of evidence are to be suppressed. *See United State v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000). In some cases, however, "blanket suppression" of all evidence seized is appropriate if the agents effected a widespread seizure of items not within the scope of the warrant and they did not act in good faith. *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000). But, "the extraordinary remedy of blanket suppression of all evidence seized 'should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search.'" *Squillacote*, 221 F.3d at 556 (quoting *United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992)).

Because the record was not clear with respect to precisely what items had been seized (much less what items had allegedly been improperly seized), an evidentiary hearing was conducted to explore such questions. That hearing was conducted on July 25, 2005. The witnesses at the hearing were Special Agent Jeffery Stillings ("Stillings") of the Bureau of Immigration and Customs Enforcement ("ICE"), ICE Special Agent Thomas R. Moore ("Moore"), ICE Special Agent Scott Lindsay ("Lindsay"), ICE Special Agent Elizabeth Hanson ("Hanson"), FBI Special Agent Michael

19

Barnes ("Barnes"), and Brookfield Police Detective Ronald S. Lagosh ("Lagosh").

In their post-hearing brief the defendants make clear that it is not suppression of particular items that they seek. Indeed, they make no meaningful effort to identify with particularity the precise items they seek to have suppressed because of their having been improperly seized. Rather, the defendants place all of their bets on the remedy of blanket suppression. Consequently, they must demonstrate that the agents in this case violated the terms of the warrant to such an extreme degree that the search was essentially transformed into an impermissible general search. In my opinion, the defendants have failed to make such showing.

During the course of the evidentiary hearing each of the witnesses gave testimony as to what part each of them played in the execution of the search warrant. Stillings testified that he was the affiant on the search warrant application. Stillings conducted a pre-search briefing with other participating law enforcement personnel concerning the nature of the search to be conducted. In that connection Stillings testified, *inter alia*, that he read to them the list of items to be searched for and seized. He told them that the list was illustrative and not all-inclusive. He also told them that the search warrant was issued relative to an alleged violation of "Title 8, harboring or concealing alien. Anything that might appear to fall within those boundaries should be taken." (Tr. at 48.) (all citations to Tr. in section II. B. of this Recommendation are to the transcript of the evidentiary hearing conducted on July 25, 2005, dkt. #105)

Moore testified that he videotaped the defendants' residence before and after the search. That videotape was played during the course of the hearing. Moore also gave testimony concerning the items that he seized and the reason why he seized such items. More particularly, Moore assisted in the search of the master bedroom. He seized the following items and for the following reasons: Line

20

Item #12, Bag #282[3] (handwritten notes pertaining to visas and naturalization because they might bear on how the victim (Ms. Martinez) came to the United States and financial information which might show payment to Martinez, employment of her and purchases on her behalf) (Tr. at 69-70); Line Item #18, Bag #356 (financial records because there might be checks to the victim, or purchases on her behalf and visa information relating to the Phillippines) (Tr. at 72); Line Item #19, Bag #682 (bank statements, cancelled checks because they might have pertained to the victim and two cards from the Phillippines in unknown language because they might have been to or concerning the victim) (Tr. at 72-73); Line Item #19, Bag #901 (phone bills, medical records, Phillippine travel documents and financial records which might have pertained to the victim and may have concerned communications pertaining to the victim) (Tr. at 73); and, Line Item #19, Bag #884 (a check register which might have shown payments to or on behalf of the victim) (Tr. at 74).

The government argues, and I agree, that

> [a]ll of these items seized by Agent Moore are within the scope of the warrant. The financial records seized are either included within the category of "financial records that may show payments consistent with employment or wages" or the absence may prove her concealment. The documents containing information regarding immigration, obtaining visas and employment of aliens [are relevant to] an element of the crime of harboring and concealing – that the defendants had knowledge of the immigration laws and therefore knowingly harbored and concealed an illegal alien. Letters from the Phillippines . . . fell under the category of correspondence concerning Martinez or her family. The phone records were also specifically listed in the warrant. The travel itinerary to the Phillippines was . . . either evidence of possible payment to Martinez or related to Martinez or her family. The medical records . . . may have produced evidence of Martinez's presence in the defendants' home.

(Gov't's Br. at 15-16, dkt. #111.)

Lagosh testified that he searched the master bedroom and helped seize computers and related

---

[3] The Line Item numbers and the Bag numbers are taken from Government Exhibit 3, which was introduced during the hearing.

digital evidence. He also seized Line Item #19, Bag #279, which were personal letters from the Phillippines. He seized these because he thought they might relate to the victim or her family. He also seized vaccination certificates in the name of Leonida Atacador because he thought they might have been Martinez's under a different name. (Tr. at 87-88.) He also seized Line Item #19, Bags #280 and #194, which were bank statements, receipts and financial expense sheets. He seized them because they were financial documents. (Tr. at 90-91.) Furthermore, he seized Line Item #19, Bag #898, which were financial documents, phone bills, internet page printouts and blank US government immigration and employment related forms. He did so because they seemed to relate to the alleged illegal harboring and immigration matters. (Tr. at 93-95.)

Lindsay testified that he participated in the search of Martinez's bedroom and the contiguous closet area in the basement. During the course of his search Lindsay seized Line Item #17, Bag #907, which were two cassettes in an unfamiliar language. (Tr. at 109.) He also seized Line Item #17, Bags #752, 753, and 670. These were numerous airmail envelopes from overseas, photo albums containing photographs of Southeast Asian persons, handwritten financial information, an address notebook, letters and cards from/to the Phillippines (some of which contained the name Martinez in the "from" or "to" line and which were written in an unfamiliar language), a receipt from the Bank of Phillippines, a Filipino passport for a woman in the name of Leonida Atacador, and an envelope that said "Nida's papers" (containing documents relating to Atacador and immigration/employment matters). Lindsay seized these materials as he thought they might be evidence of communications between Martinez and her family and because he thought that Martinez and Atacador might be the same person. (Tr. at 109-114.) Moreover, Lindsay seized certain financial documents and tax returns, as he thought they might show payments to Martinez, or might show deductions or expenses

22

relating to Martinez. (Tr. at 114.)

Barnes testified that he assisted in the search of Martinez's bedroom and bedroom closet. He seized Line Item #17, Bags #753, 669, 758, 673, and 759. These consisted of a wedding announcement for Jack Calimlim, a notepad with handwritten financial information for store purchases, financial entries and some letters in an unfamiliar language, and numerous letters from the Phillipines. (Tr. at 128-133.) Barnes seized these items because he viewed them to be listed in the warrant as items to be seized.

The defendants argue that the agents seized documents that were not identified in the warrant. Specifically, in attacking the actions of Lagosh (and the instructions given by Stillings at the pre-search briefing upon which Lagosh relied) they assert:

> LaGosh's understanding of the parameters of the warrant led him to seize, among other things, financial statements titled "Jefferson M. Calimlim, M.D., S.C." (Tr., p. 99-100), as well as a brochure from the law firm of Michael, Best & Friedrich, which LaGosh characterized as a "financial document." (Tr., p. 100-101). LaGosh further testified that he took all phone records he found and "anything that looked like it had anything to do with the Phillipines."

(Defs' Br. at 6, dkt. #108.) In further and more detailed support of their argument that the agents so far exceeded the bounds of the warrant that suppression of all evidence obtained via execution of the warrant should be ordered, the defendants filed two exhibits along with their brief. Both exhibits are charts which, according to the defendants, summarize the documents seized from the Calimlims' home. One chart is organized by Bates page number (Defs.' Exhibit 1, dkt. #108-2) and the other by line item number (Defs.' Exhibit 2, dkt. #108-3), based on the government's line item list which was admitted into evidence as government Exhibit 3 at the evidentiary hearing.

To be sure, the charts identified as Defs.' Exhibits 1 and 2 and the general description of

23

items seized might seem, at first blush, to support the defendants' argument. But, upon a closer examination, they are not quite so convincing.

For instance, included in Bates #2000-2817 are a large number of bank records. These include bank statements and copies of checks drawn on the account of Jefferson N. Calimlim, M.D., S.C., which are found at Bates # 2004-2415. However, Paragraph 7 of the warrant called for the seizure of "Financial records that may show payments consistent with employment or wages." And the bank records of Jefferson N. Calimlim, M.D., S.C. fall squarely within the confines of paragraph 7. More to the point, such financial records could reasonably "show payments consistent with employment or wages." Indeed, many of the checks drawn on the account do indicate that they are for payroll. See, for example, Bates # 2187, checks # 4175 & 4176; Bates # 2189, checks # 4170 & 4167; Bates # 2268, checks # 3934 & 3936; Bates # 2353, checks # 3970 & 3971; Bates # 2404, checks # 3973, 3986 & 3987; and Bates # 2415, checks # 4035 & 4036.

Moreover Bates # 2430-2615 and 2626-2726 are telephone toll records and bills. The seizure of these items is squarely called for by paragraph 8 of the warrant, to wit, "Phone records for long distance and international calls." The same can be said for the telephone toll records and bills found at Bates # 2820-2895.

More bank records are found at Bates # 2937-2996. These are for an entity called Akami Healthcare Solutions, Inc. These, like the above-identified bank records of Jefferson N. Calimlim, M.D., S.C., fall squarely into paragraph 7 of the warrant. Indeed, Bates #2959, check # 1018 is a payroll check.

Similarly, Bates # 2997-3056 could reasonably fall into paragraph 7 of the warrant. Indeed, as noted by the defendants themselves in Defs.' Exhibit 1, the document found in such Bates pages

24

appears to be a composition book. The notes entered in such composition book appear to involve nurse recruiting. As such, it could reasonably fall into paragraph 7, to wit, "[f]inancial records that may show payments consistent with employment or wages."

The same could be said for Bates # 3220-3469. These are the tax returns and related information belonging to Jefferson N. and Elnora Calimlim. To be sure, they are the Calimlim's personal tax returns. But, attached to such returns is a Schedule C, which indicates that they ran a business, to wit, a medical practice.

Similarly, Bates # 4305-4483 (including several pages following # 4483, which are not numbered) are historical financial records of Jefferson N. Calimlim, M.D., S.C. Although some of the individual documents contained within the grouping might arguably seem on their face to fall outside the warrant, at the same time, some of the individual documents contained within the grouping contain information relating to amounts paid to employees of that corporation. Consequently, the records as a whole reasonably fall into paragraph 7 of the warrant, to wit, "[f]inancial records that may show payments consistent with employment or wages." The same can be said for Bates # 4675- 4692, and 4809-4825, which are the corporate income tax returns of Jefferson N. Calimlim, M.D., S.C.

Likewise Bates # 3483-3507 and 3976-4050, which are checking account records of Jefferson N. and Elnora Calimlim, and Bates # 3604-3723, which are bank reconciliation records and U.S. Bank checking account records for Jefferson N. Calimlim, M.D., S.C., are items that reasonably fall into paragraph 7 of the warrant. Indeed, some of the checks drawn on the US Bank account indicate that they are for payroll. See, for example, Bates # 3607, check # 4422 and Bates # 3624, check # 4419.

Similarly, Bates # 5068-5090 are check registers, which would fall within the scope of paragraph 7 of the warrant. Likewise, Bates # 4827-5066 are self-identified as Payroll Books. As such, they clearly fall within the scope of paragraph 7 of the warrant.

Bates # 3538-3542, 3546-3547, 3557-3559, 3565-3567, 3569-3570, 3572-3576, 3578-3581, 3583-3587, 3590-3592, 3594-3596, 3738-3972, 4183-4193, and 4248-4303 are telephone bills and toll records. Consequently, they were all properly seized in accordance with paragraph 8 of the warrant.

Bates # 5095-5358, 5373-5382, 5384-5413, 5876-6185, and 6186-6554, which were found in the bedroom being used by Martinez, consist of, *inter alia*, a passport for Leonida P. Atacador, numerous photographs, numerous letters written in a language other than English, an address book, a personal calendar/date book identified as belonging to "Irma Martinez," a receipt from Bank of Phillippines Islands in the name of Cifirina Martinez, an Irma Martinez diary and an Irma Martinez address book. In my opinion, the seizure of such items would reasonably have been called for by paragraphs 1, 2, 3, 4 and 10 of the warrant.

To be sure, there are some items which were seized that might arguably have fallen outside the scope of the warrant. For example Bates # 4050-4116 and 4166-4182 are advertising brochures for the law firm of Michael, Best & Friedrich, LLP and might not reasonably have been subject to seizure under the warrant. The same could be said for the personal income tax returns of Jefferson M. Calimlim and Christina Calimlim, which are located at Bates # 4701-4748. But, as the foregoing demonstrates, the overwhelming majority of the items that were seized fell well within the scope of the warrant.

As stated previously, "the extraordinary remedy of blanket suppression of all evidence seized

26

'should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search.'" *Squillacote*, 221 F.3d at 556. Despite the defendants' protestations to the contrary, this was not an impermissible general search. Indeed, the testimony demonstrates that the agents did not search for and seize items indiscriminately. To the contrary, the testimony, Government Exhibit 1(the video taken of the defendants' house), and Government Exhibit 2 (the blueprint of the defendants' house) reveal that the defendants' house is, to put it mildly, large. Yet, as Government Exhibit 3 makes clear, nothing was seized from bedrooms 2, 3 or 5; the sun room; the laundry room; the kitchen and breakfast room; the dining room; the family room; or the living room. Moreover, neither the garage nor the storage room above the garage were even searched.

This takes me to the search of the computers. The warrant called for the seizure of any computers found in the house. The warrant also set forth the following with respect to the method by which the computers were to be searched for evidence.

1.    In conducting the search authorized by this warrant, the agents shall make reasonable efforts to use computer search methodologies that avoid searching files, documents or other electronically stored information that is not identified in the warrant. To that end, the search procedure of the electronic data contained within the computer and computer media may include, for example, any or all of the following techniques:

A.    Surveying various file "directories" and the individual files they contain (analogous to  looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

B.    "Opening" or cursorily reading the first few "pages" of files in order to determine their precise contents;

C.    "Scanning" storage areas to discover and possibly recover deleted data;

D.    Scanning storage areas for deliberately hidden files; and

27

E.   Performing key word searches in electronic storage areas to determine whether occurrences of language contained in such storage areas exist that pertain to the subject matter of the investigation.

2.   The warrant and this search procedure specifically exclude a search for any kind of unopened electronic mail.  No search of unopened mail shall be conducted without a separate search warrant supported by probable cause.  Appropriate efforts shall be made to minimize the disclosure of records and other information that are not the subject of this warrant.

(Search Warrant, Case No. 04-M-295.)

Agent Hanson testified regarding the method by which she conducted a search of the two of the computers. [4]  Hanson used two forensic tool kit programs, F.T.K. and Encase.  (Tr. at 142.) She searched data and unallocated space, which included e-mails, the internet, typed documents, and deleted items.  (Tr. at 154.)  Hanson conducted the forensic examinations using the keyword and scanning methodologies. (Tr. at 143.)  Hanson would "scan" the item by briefly reading it.  (Tr. at 177.)

The government argues, and I agree, that

[t]he keywords used by Hanson in the forensic examination are supported by the category of 10 items to be seized and the attached affidavit.  Hanson obtained the first set of keywords form SA Stillings, and then formulated additional words based on the background of the case.  Tr., pp. 151-52.  A review of the keywords used by Hanson demonstrates that she made a reasonable effort to limit her search to items identified in the warrant.  The terms used by Hanson can generally be categorized as relating to employment, wages, and overseas payment to Martinez (funds, transfer, money, $400, wire, deposit, Mendoza); Martinez's employment with the defendants (domestic, servant, maid, cleaning, cooking, laundry); records relating to Martinez's alienage

---

[4] Special Agent Jarrod Winlke of DHS-ICE did not testify at the hearing.  However, on September 13, 2005, the parties filed a stipulation that stated, in pertinent part, that "Winkle's examination of the five computers was conducted in a fashion similar to the methodology employed by Special Agent Hanson with respect to the Sony computers, as testified to by Special Agent Hanson in the July 25, 2005 evidentiary hearing.  Special Agent Winkle examined the internet histories, websites visited, e-mails and documents in the five computers.  He also utilized Encase software to perform key word searches of the data in each computer." (Stip. ¶ 5, dkt. #113)

and immigration status (passport, immigration, documents); and correspondence to family (Juan Martinez, Ceferian Martinez, Yuan Martinez, Phillippines, Gianza, Camarines Sur, Malbong.). <u>See</u> Defense Exhibit 2.

(Gov't's Br. at 20-21, dkt. #111.) Moreover, contrary to the defendants' suggestion otherwise, I am satisfied that Hanson's reviewing of the websites found in the "cookies" computer master index was authorized by the warrant. After all, the "cookies" are part of the electronic data stored on the computer. And the warrant called for the search of "[r]ecords, in whatever form kept or stored (i.e., any data storage medium." (Search Warrant, Case No. 04-M-295.)

There is one aspect of Hanson's search of the computers, however, that warrants a bit more discussion. And that would be her search of electronic mail, i.e., e-mails.

As noted previously, the search warrant stated, in part, as follows: "The warrant and this search procedure specifically exclude a search for any kind of unopened electronic mail. No search of unopened mail shall be conducted without a separate search warrant supported by probable cause." Contrary to what one might assume to be the case, Hanson testified that "unopened electronic mail" is not electronic mail that has been downloaded from a server onto a personal computer but not yet read by the computer operator. Instead, according to Hanson, the term "unopened electronic mail" refers to electronic mail that is with a person's email provider (such as Hotmail, Yahoo, AOL, etc.) and has not yet been downloaded onto the person's personal computer. In other words, the terms "open" and "unopened" are not synonymous with the terms "read" and "unread." (Tr. at 181.)

Consequently, Hanson "scanned" (or briefly read) all 999 emails that she found in the computers upon which she conducted her forensic examination. The defendants argue that, by doing so, Hanson violated the express terms of the warrant.

As stated previously, the defendants do not argue for the suppression of particular items of

29

evidence. Instead, they argue for blanket suppression of all evidence obtained as a result of the execution of the warrant of September 29, 2004. Consequently, it is not necessary for the court to rule on whether Hanson's interpretation of the "Do not read unopened email" requirement of the warrant was contrary to such requirement and, if so, whether any evidence obtained as a result of her reading "unopened email" that was on the personal computers should be suppressed. Instead, it is only necessary for the court to decide whether Hanson's "scanning" all of the emails found on the computers (assuming *arguendo* that Hanson was wrong in her interpretation of the warrant) converted the search in this case to a widespread, exploratory general search, thereby justifying blanket suppression of all seized evidence.

"The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search. Accordingly, to satisfy the first prong of the two-part test described above [widespread seizure of items not in the warrant], the search conducted by government agents must actually resemble a general search." *Liu*, 239 F.3d at 141 (citations omitted). And "[t]o satisfy the second prong [not in good faith], it is not the search itself that must resemble a general search. Rather, the search must resemble a general search in the sense that it – like a general search – is not conducted in good faith. *Id*. at 141 n.3.

For the reasons stated previously, the search of the Calimlims' home was not conducted in such a manner as to resemble a general search. There was no indiscriminate rummaging throughout the house. Instead, the agents focused on finding particular types of documentary evidence. Consequently, even assuming that Hanson was incorrect in her interpretation of what the warrant required in the way of not reading unopened email, that she scanned all the email would not serve

to convert the entire execution of this warrant into a general search prohibited by the Fourth Amendment.

Moreover, the second prong of the test for blanket suppression of evidence requires it to be shown that the search was not conducted in good faith. Simply stated, the defendants have not made any effort to show that Hanson conducted her email search in bad faith. Even more importantly, Hanson's uncontradicted testimony demonstrates that she conducted the search in good faith. Specifically, Hanson testified that, not only she, but most of the forensic examiners that she works and associates with, view "unopened email" as being email which is still with the server and not yet downloaded onto a personal computer. (Tr. at 178-181.)

In sum, and for all of the foregoing reasons, it is my opinion that execution of the search warrant of September 29, 2004 was not conducted in such a fashion that the search was converted into a general search. Consequently, to the extent that the defendants' motions seeks suppression of all evidence seized during the execution of the warrant, it is recommended that the defendants' motions be denied.

There is one final matter to address. The defendants argue that Stillings caused false information to be submitted to Magistrate Judge Gorence in support of his application for the September 29, 2004 search warrant. Specifically, the defendants assert that Stillings' application for the warrant included the affidavit he had used to apply for the search warrant of September 28, 2004.

> That affidavit, based largely on the statements of an anonymous caller, represented that (1) Martinez was living in the basement in a wine cellar, which was used as a bedroom (¶ 8); (2) Martinez was locked in the basement of the home, and only let out for the purpose of cleaning, caring for the children, cooking, laundry, walking the family's dog, or occasional visits to the church (¶ 9); (3) that the caller "broke down and cried on the phone. The caller requested that the Department of Immigration

31

follow-up on this tip as soon as possible for the benefit of Martinez's welfare. The caller stated that no one should live under those conditions, that it is just not humane and hopes that Immigration will approach the situation very carefully because the Calimlim family is (sic) the only people Martinez knows" (¶ 12); and (4) that Stillings believed this anonymous caller to be truthful and reliable (¶ 4).

(Defs' Br. at 16, dkt. #108.)

According to the defendants, by the time Stillings submitted his application for the September 29, 2004 search warrant, to which his earlier affidavit was appended and made a part thereof, he knew that certain information which had been given by the anonymous caller was not correct. Specifically,

[h]e knew that Martinez lived in a bedroom in the basement, not a wine cellar. (Tr., p. 54). The basement was carpeted, furnished, and had, among other things, a bar, a big screen television, audiovisual equipment, and a dance floor (Tr., p. 10-11, 14, 26). He knew that the door on Martinez's bedroom could only be locked from the inside, not the outside (Tr., P. 54). He knew that there was a stairway within 10-15 feet of Martinez's room which led out of the house (Tr., p . 55). He knew that the door at the top of this staircase, leading out of the home, could not be locked from the outside (Tr., p. 55).

Despite knowing all these things, Stillings did not correct the affidavit or otherwise alert Magistrate Judge Gorence to the fact that these assertions were false (Tr., p. 57-58). Stillings admitted that he presented false information to the Magistrate Judge in obtaining the September 29 warrant. (Tr., p. 57-58).

(Defs' Br. at 17, dkt. #108.) However, the defendants do not seek relief under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).[5] Instead, they use this alleged wrongdoing on the part of Stillings to further support their argument that this court should order blanket suppression of all evidence seized

---

[5] That the defendants have not sought such relief is understandable. Under *Franks*, where factual inaccuracy of the affidavit is alleged, a warrant is invalidated only if it is established that the affiant was guilty of deliberate falsehood or reckless disregard for the truth, and if, with the affidavit's false material set to one side, the information remaining in the affidavit is inadequate to support probable cause. *Franks*, 438 U.S. at 171. Even if the information claimed by the defendants to be false were stricken from the affidavit, this would not have rendered the application for the September 29, 2004 search warrant deficient for lack of probable cause.

32

under the September 29, 2004 search warrant. They assert that "the failure to disclose material information to the Magistrate Judge can 'enlighten [the court's] review of the search and seizures that actually took place as [the court] determines whether or not the agents went beyond the confines of the warrant.' *United States v. Rettig*, 589 F.2d 418, 422 (9th Cir. 1979)." (Defs.' Br. at 17, dkt. #108.)

But, this court has already determined that the executing agents did not stray from the confines of the warrant to such a degree that blanket suppression of all evidence seized under the warrant is appropriate. In that respect the facts in the instant case are markedly different than those in *Rettig* where the court found that "the agents did not confine their search in good faith to the objects of the warrant, and that while purporting to execute it, they substantially exceeded any reasonable interpretation of its provisions." *Rettig*, 589 F.2d at 423. Thus, the court ordered blanket suppression because it was not possible to determine "after the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant." *Id.*

Finally, the defendants argue that "[h]ad the Magistrate Judge known the truth, it is quite possible that she would have issued a warrant far more narrow in scope than the warrant that was issued." (Defs' Br. at 19, dkt. #108.) I disagree. Even assuming that Stillings had advised Magistrate Judge Gorence that the above-described information which had been previously provided by the anonymous caller had turned out to possibly be incorrect, the fact remains that the violation of law for which evidence was being sought under the warrant was Title 8 U.S.C. § 1324(a)(1)(A)(iii). That statute reads as follows:

(a) **Criminal penalties.** (1)(A) Any person who –

33

. . . .

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

. . . .

shall be punished as provided for in subparagraph (B).

Each item and category of evidence sought under the warrant was relevant to such alleged violation regardless of whether Martinez was being held in the Calimlim's home with her consent or against her will.

In conclusion, and for all of the foregoing reasons, to the extent the defendants' motions to suppress are predicated on the proposition that the September 29, 2004 warrant was executed in a manner that violated its terms, it will be recommended that their motions to suppress be denied.

## C. Motion to Strike Surplusage

The defendants seek an order striking from the superseding indictment as surplusage the initials "I.M." In the defendants' view, identifying the Filipino national who was allegedly harbored by the Calimlims as "I.M."

> is prejudicial to the defendants because it creates the impression that, for safety reasons, "I.M.'s" name must be withheld from the indictment. As the government knows, the Calimlims are well aware of the identity of "I.M." – the government seized I.M. from the Calimlim's home in Brookfield, where she had lived for over fifteen years – and there is no need to refer to her by initials. Any arguable need to do so is outweighed by its prejudicial impact on the defendants.

(Defs.' Motions at 1-2, dkt. #43 & 55.)

In its response the government does not offer any reason why the allegedly harbored alien is

34

identified merely by her initials. And, quite frankly, the court cannot think of any reason why the superseding indictment identifies her by her initials instead of by her full name. Be that as it may, the defendants' motions will be denied.

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment . . . ." The Advisory Committee Notes to subdivision (d) explains that the "rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." In other words, "legally relevant information is not surplusage." *United States v. Bucey*, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988). Moreover, motions to strike should be granted "only if the targeted allegations are *clearly not* relevant to the charge and are inflammatory *and* prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518 (N. D. Ill. 1990) (quoting *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987)). Simply stated, the identity of the allegedly harbored alien in the instant case is not irrelevant to the charges. Indeed, in order to prove its case against the defendants the government is going to have to prove that they harbored an illegal alien. And, in order to do that, it seems clear that the government is going to offer evidence as to the identity of that illegal alien and the circumstances under which she was allegedly harbored.

### D. Jefferson N. Calimlim's Motion to Suppress Statements

On March 9, 2005, an evidentiary hearing was conducted on Jefferson's motion to suppress. The testimony at that hearing was as follows.

### Michael Barnes, Special Agent of the Federal Bureau of Investigation

Michael Barnes testified that he is Special Agent of the Federal Bureau of Investigation. On

35

October 4, 2004, he was present when Jefferson N. and Elnora M. Calimlim appeared in court for their initial appearance. (Tr. at 5.) (all citations to Tr. in section II. D. are to the transcript of the evidentiary hearing held on March 9, 2005, dkt. #79) Previously, Barnes had interviewed Sherry Bantug. Bantug is the former spouse of Christopher Jack Calimlim. (Tr. at 5-6.) During the course of that interview of Ms. Bantug, Barnes had asked her to write down the friends of Jefferson N. and Elnora M. Calimlim and to rank them in order of importance. On that sheet of paper (which was marked as Exhibit #1) Bantug had written the names of Maximillion ("Max") and Leticia Cueto; Dr. Salvador Delrosario; Dr. Celestino Perez and Enny Perez, his wife; and, Senen Arcilla. (Tr. at 7-8.)

Barnes testified that on October 4, 2004, he was present when Jefferson N. Calimlim was processed by the United States Marshal. The other persons present when the Marshal processed Dr. Calimlim were the Deputy U.S. Marshal and Special Agent Jeffery Stillings. During the course of the processing of Dr. Calimlim, neither Barnes nor Special Agent Stillings asked him any questions. The only thing that Special Agent Stillings did was ask Dr. Calimlim to move and stand for a picture. (Tr. at 9.)

The only questions that were asked of Dr. Calimlim that day were asked by the Deputy U.S. Marshal. Barnes was present for some of those questions. At no time did Barnes request that the Deputy U.S. Marshal provide him with any records that resulted from their questioning of Dr. Calimlim. (Tr. at 10.) Barnes further testified that there was no information that he obtained during the course of Dr. Calimlim's processing that he used in his investigation in this matter. (Tr. at 10.)

On cross-examination, Barnes testified that he was present at the processing of Dr. and Mrs. Calimlim for the purpose of his obtaining fingerprint cards and pictures for the FBI files. (Tr. at 11-

12.)

**Charles Rowland, Deputy United States Marshal**

Rowland testified that he is a Deputy United States Marshal and conducted the processing of Dr. Jefferson N. Calimlim on October 4, 2004. Rowland testified that there are several forms that he is to fill out when processing someone who has been brought to the Office of the U.S. Marshal. On those forms there are a number of questions that are asked of the person being processed. This would include biographical information such as age, date of birth, height, weight, whether the defendant is married, his or her address, and telephone number. The person being processed is also asked about their associates. This is for the purpose of the Marshal's having a contact "as far as getting rid of property, any leftover money, things like that, we have a point of contact. If something would happen to them at a local facility, we have a point of contact to notify." (Tr. at 15.)

Rowland testified that neither Special Agent Stillings nor Special Agent Barnes asked any questions of Dr. Calimlim during the processing. (Tr. at 15.) According to Rowland, the purpose of the Marshal's processing is "just getting the information, assigning a Marshal number for tracking purposes." (Tr. at 16.)

On cross-examination, Rowland acknowledged that among the information called for by the Marshal's form was the vehicles that are available to a person who is being processed, and where they do their banking. (Tr. at 17.) Rowland did not know the purpose behind asking where they bank. (Tr. at 17-18.) Rowland testified that one of the purposes of the processing is to have a Marshal's Service number assigned to the person being processed. This is a number that is used by the Marshal's Service for tracking. (Tr. at 18.) Additionally, the Marshal's Service takes fingerprints

37

and pictures during the processing procedure. (Tr. at 18.) Rowland further testified that prior to October 4, 2004, Rowland had processed individuals. According to Rowland, it is not unusual for representatives of agencies who are conducting an investigation to be present during the processing of a defendant. (Tr. at 20.) However, Rowland did not have any conversations with either Special Agent Stillings or Special Agent Barnes relative to any of the questions that were going to be asked of Dr. Calimlim. (Tr. at 20.)

### Richard Lee Hanson, Special Agent with the Bureau of Immigration and Customs Enforcement

The next witness to testify was Richard Lee Hanson. Hanson testified that he is a Special Agent with the Bureau of Immigration and Customs Enforcement and was so employed on October 4, 2004. (Tr. at 22.) Hanson was present on October 4, 2004, when Dr. Jefferson Calimlim and Dr. Elnora M. Calimlim were processed by the U.S. Marshal. Hanson testified that he was there to get fingerprints from the defendants manually so that he might put them on the forms of the Bureau of Immigration and Customs Enforcement. This is because the Bureau of Immigration and Customs Enforcement needs to keep a separate file on all aliens, such as the defendants in this case. (Tr. at 23.) Hanson recalled it was the Deputy U.S. Marshal who asked questions of the Calimlims that day. (Tr. at 23.)

On cross-examination, Hanson testified that he recalled questions being asked of the Calimlims relating to their acquaintances "as far as emergency contact information." (Tr. at 24.) Hanson did not recall who asked those questions. Hanson testified that the entire processing took approximately 45 minutes to an hour. (Tr. at 24.) The reason it took this long is because there were some issues that presented themselves with respect to Hanson's getting his own copy of the

38

Calimlims' fingerprints. (Tr. at 25.) Specifically, he was unable to use the ink that was available in the Marshal's office. Thus, a copy of the fingerprints that the Marshal had already obtained for processing was copied onto the fingerprint card that Hanson had. (Tr. at 25-26.) Hanson did not take a picture of the defendants. (Tr. at 26.)

At the close of all the evidence, the parties presented a stipulation to the court. The stipulation is that "this court as a part of the condition of Dr. Calimlim's release ordered that Dr. Calimlim be processed by the marshals before he could leave the building." (Tr. at 28.)

Despite having been afforded an opportunity to file a memorandum of law in support of his motion to suppress, Jefferson has not filed any written argument. To be sure, at the close of the evidentiary hearing Jefferson's counsel suggested to the court that there may be something untoward about the court's ordering a person such as Jefferson to appear for processing at the U. S. Marshal's Office after arraignment as a condition of his being released on bond. This is because, as was made clear at the hearing, the steps taken by the Marshal's Office in processing a prisoner include asking the prisoner questions about where they bank, what type of automobile they drive and who their friends and associates might be. But, the defendant has not offered any legal argument as to why Jefferson's answers to such questions should be suppressed in the case at bar. Thus, the court assumes that Jefferson is not pursuing his motion to suppress and that he has abandoned it. For that reason, it will be recommended that Jefferson's motion to suppress his statements be denied.

### E. Jefferson M. Calimlim's Motion to Suppress Statements

On March 9, 2005, an evidentiary hearing was conducted on Jefferson, Jr.'s motion to suppress statements. At its heart, Jefferson, Jr.'s motion is predicated on the proposition that he was

in custody at the time he was questioned by FBI Special Agent Vitale; that he was not advised of his constitutional rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to such questioning taking place; and that therefore such statement should be suppressed. The testimony at the evidentiary hearing was as follows.

**Stephen Vitale, Special Agent of the Federal Bureau of Investigation**

Special Agent Stephen Vitale of the Federal Bureau of Investigation testified that he participated in the execution of a search warrant at the Calimlim residence in Brookfield, Wisconsin, on September 29, 2004. Once the agents arrived at the residence and entered the same, Vitale and another FBI agent went upstairs to the bedroom of Jefferson M. Calimlim ("Jefferson, Jr."). (Tr. at 36.) (citations to Tr. in section II. E. are also to the March 9, 2005 evidentiary hearing, dkt. #79) As Vitale and the other agents entered the house and proceeded to the next level of the house, they announced "FBI Search Warrant." The other agent who proceeded up the stairs with Vitale was FBI Special Agent Susan Blish. Once they reached the top of the stairs, Blish entered a bedroom at the top of the stairs. Vitale was following shortly behind her. (Tr. at 37-38.) As she entered the bedroom, Blish turned around and told Vitale that "he was in the bathroom." (Tr. at 38.) Thus, Vitale entered the bedroom and saw Jefferson, Jr. sitting on the commode. The bathroom door was open at the time. (Tr. at 38.)

Vitale had his credentials out and identified himself as an FBI agent and he asked the person sitting on the commode if he knew the whereabouts of Irma Martinez. (Tr. at 39.) At that point, according to Vitale, Agent Blish had left the bedroom and had gone down the hallway to the other bedrooms. Jefferson, Jr.'s response to Vitale's question was that he did not know where Irma

40

Martinez was. At that point, Vitale asked Jefferson, Jr. when the last time was that he saw Ms. Martinez. Jefferson, Jr.'s initial response was that he didn't know. At that point, Vitale again pulled his credentials out and said again, "I am an FBI agent, it's important that you not lie to me, when is the last time that you saw Irma Martinez?" Jefferson, Jr. answered that it was about a year ago. (Tr. at 39.)

According to Vitale, this conversation lasted less than one minute. Vitale testified that his "tone [of voice] was more stern. I wasn't yelling, but we were conducting a search warrant looking for a person, so there was some urgency to that matter. His [Jefferson, Jr.'s] tone, my impression, was that he was pausing because he wasn't being truthful and trying to come up with an answer." (Tr. at 40.)

Vitale was armed at this time. However, his firearm was not visible. His firearm would have been concealed by his vest. At no time during his conversation did he threaten to arrest Jefferson, Jr. At no time was Jefferson, Jr. physically restrained, at least not while he was in the presence of Agent Vitale. (Tr. at 40.)

After Jefferson, Jr. informed Vitale that he hadn't seen Irma Martinez within a year, he proceeded to finish up in the bathroom. He and Vitale then proceeded downstairs where the rest of the family was convening with the other agents. At that point, Vitale left Jefferson, Jr. and went down to the basement where the case agents were executing the search warrant looking for Ms. Martinez. (Tr. at 41.)

According to Vitale, he, Vitale, never entered the bathroom while Jefferson, Jr. was in it. This is because Vitale was able to see Jefferson, Jr. clearly from the bedroom. It was not a very large

41

area. Vitale had eye contact and was able to see Jefferson, Jr. as he proceeded to get up and get his clothes on and leave the bathroom and proceed downstairs. (Tr. at 41.) According to Vitale, the distance between where he was standing and the bathroom where Jefferson, Jr. was located was approximately 15 feet. (Tr. at 41.)

Vitale testified that during the time that he was questioning Jefferson, Jr., Jefferson, Jr. was free to leave. He never told him that he could not leave the premises. Mr. Vitale described Jefferson, Jr.'s demeanor as quiet and cautious. (Tr. at 41-42.)

On cross-examination, Vitale testified that prior to September 29, 2004, he had never met Jefferson, Jr. His description of Jefferson, Jr.'s demeanor was, therefore, based on his experience with other people whom he had interviewed. It was not based upon any prior familiarity with Jefferson, Jr. (Tr. at 42-43.)

At the time that Vitale participated in the execution of the search warrant, his recollection is that Irma Martinez's bedroom was thought to possibly be in the basement. (Tr. at 45.) At the time the warrant was executed, it was "early morning." Specifically, Vitale thought it was "before 7:00 a.m." (Tr. at 45.)

Vitale testified that at the time he asked Jefferson, Jr. questions about the location of Irma Martinez, Vitale knew or believed that Ms. Martinez was an illegal alien. Vitale had also been told in the briefing prior to the execution of the search warrant that Irma Martinez might be harbored or concealed at the Calimlim residence. (Tr. at 48.)

Vitale further testified that Agent Blish was not in a position to be part of the conversation that he, Vitale, was having with Jefferson, Jr. while Jefferson, Jr. was in the bathroom. (Tr. at 49-

42

50.)  According to Vitale, after Jefferson, Jr. got up from the commode, Vitale asked him to go downstairs with him.  (Tr. at 51.)

At no time prior to Vitale's asking Jefferson, Jr. about Ms. Martinez did he, Vitale, advise Jefferson, Jr. of his constitutional right to remain silent; nor did he advise him that any statement he made could be used against him in a court of law; nor did he advise him that he had a right to consult with an attorney before any questioning; nor did he advise him that he had a right to simply refuse to talk to Agent Vitale.  (Tr. at 52.)

**Jefferson M. Calimlim**

Defendant Jefferson M. Calimlim testified.  Jefferson, Jr. testified that his date of birth is May 28, 1974.  He has a college bachelor's degree in business administration, specializing in information technology.  (Tr. at 53.)  This is from Marquette University.  (Tr. at 53-54.)

Jefferson, Jr. has never been charged with a crime, nor has he ever been arrested by the police.  (Tr. at 54.)  On September 29, 2004, Jefferson, Jr. lived at 19120 Still Point Trail in Brookfield, Wisconsin.  That residence is owned by his parents.

Jefferson, Jr.'s bedroom is located on the second floor of the residence.  From his bedroom, he has a view of the front door of the house in the sense that the front door of the bedroom overlooks the front door of the house.  Immediately located outside of the bedroom is a hallway which goes to the stairway leading to the first floor.  (Tr. at 54-55.)  Attached to Jefferson, Jr.'s bedroom is a bathroom.  He is able to enter the bathroom from his bedroom.  There is another entrance to the bathroom from the hallway.  (Tr. at 55-56.)

On September 29, 2004, at approximately 6:00 a.m., Jefferson, Jr. was sleeping.  Knocks on

the front door of the house awakened him.  In response to hearing the knocks, Jefferson, Jr. went to the guest bedroom and peeped through the window just to see who was knocking.  The guest bedroom is a bedroom different from his.  When he looked outside Jefferson, Jr. saw a lot of people in front of the house.  He thought it might have been some workers, but he did not know.  (Tr. at 56.)

He then walked back into his bedroom where he heard more knocks at the front door. Jefferson, Jr.'s father, Jefferson N. Calimlim, answered the door.  Jefferson, Jr. saw his father open the door.  At that point, Jefferson, Jr. saw a "whole bunch of agents."  Jefferson, Jr. saw Agent Stillings come to the front and present his badge to Jefferson, Jr.'s father.  (Tr. at 57.)  Agent Stillings said that he had a search warrant for Irma Martinez.  (Tr. at 57-58.)

Jefferson, Jr. went back to his bedroom.  At that point Agent Vitale and Agent Blish came into the bedroom.  According to Jefferson, Jr., the agents "just asked where I was going.  I told them I was going to the bathroom."  (Tr. at 58.)  At the point at which Jefferson, Jr. answered their question he, Jefferson, Jr., was still in the bedroom.  (Tr. at 58.)  To that, Agent Vitale said, "okay." (Tr. at 59.)

Jefferson, Jr. interpreted Agent Vitale's saying, "okay" as giving him permission to go to the bathroom.  (Tr. at 59.)  When Jefferson, Jr. went to the bathroom, he sat down on the commode, and pulled his pants down so that he might urinate.  At that point, Jefferson, Jr. asked Agent Vitale if he could close the door.  Agent Vitale, who at that time was in the bedroom, "said no, keep the door open."  (Tr. at 60-61.)

As Jefferson, Jr. was using the commode, there was a conversation between him and Agent Vitale.  Vitale asked Jefferson, Jr. about the whereabouts of Irma Martinez.  Jefferson, Jr. responded

44

to Vitale's questions.  (Tr. at 61.)

At no point prior to asking Jefferson, Jr. questions about Irma Martinez did Vitale advise him that he had a right to remain silent; nor did he tell him that he had a right to have a lawyer present before answering any questions; nor did he tell him that anything he said could be used against him in a court of law.  (Tr. at 61-62.)

According to Jefferson, Jr., the knocking on the front door occurred at approximately 5:15 a.m.  (Tr. at 62.)

After he finished in the bathroom, Jefferson, Jr. went downstairs "because the agent wanted me to go downstairs."  (Tr. at 62-63.)  According to Jefferson, Jr., he did not feel at that point that he had an option as to whether he could or could not go downstairs or to bed.  (Tr. at 63.)  According to Jefferson, Jr., when he was being asked questions by Agent Vitale he felt he did not have an option about answering.  According to Jefferson, Jr., "he was asking me questions and told me that I had to answer those questions."  (Tr. at 63.)  Jefferson, Jr. testified that he felt intimidated by Agent Vitale.  He felt that he was not free to get up and leave the bathroom.  At the time that he was answering Agent Vitale's questions, there was nobody else in the bathroom other than Jefferson, Jr. Moreover, as far as Jefferson, Jr. knew, at the time he was answering Agent Vitale's questions there was nobody else in the bedroom with Agent Vitale.  According to Jefferson, Jr., at the time that Agent Vitale was asking him questions, he was practically five feet away from him.  (Tr. at 64.)

On cross-examination, Jefferson, Jr. testified that prior to his going to the bathroom he had grabbed his cell phone.  At that point, the agents came in.  Jefferson, Jr. testified that he had his cell phone in his pocket.  He also testified, however, that the agent did not see him take his cell phone.

45

(Tr. at 69-70.) According to Jefferson, Jr., he contacted "our attorney" that morning. This was after everybody was downstairs. (Tr. at 70.)

According to Jefferson, Jr., once he was seated in the bathroom and approached by Agent Vitale, Agent Vitale did not threaten him. (Tr. at 73.) Jefferson, Jr. did not see a weapon on Agent Vitale. Agent Vitale was dressed in a business suit. Agent Vitale addressed him in a professional, but a stern tone. (Tr. at 74.)

While Jefferson, Jr. was sitting in the bathroom, he was asked three questions. He was not asked to provide any personal information. According to Jefferson, Jr., it took "two minutes" for the three questions to be asked and answers to be given.

According to Jefferson, Jr., Agent Vitale never physically touched him. (Tr. at 75.) He also never threatened to arrest Jefferson, Jr. He also never told Jefferson, Jr. that he was going to be charged with a crime. (Tr. at 76.)

It is undisputed that Jefferson, Jr. was not advised of his *Miranda* rights prior to his being questioned by Vitale concerning Irma Martinez's whereabouts. Thus, the only issue to be decided is whether Jefferson, Jr. was in custody at the time he was questioned by Vitale. In my opinion, he was not in custody.

Under the Supreme Court's benchmark decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect must be warned of his constitutional rights before he is subjected to custodial interrogation. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Because *Miranda* warnings are required to be given only to suspects who are subjected to "custodial

46

interrogation," *Illinois v. Perkins,* 496 U.S. 292 (1990), the threshold inquiry in determining whether *Miranda* warnings are required is whether the suspect was in fact in custody. *California v. Beheler,* 463 U.S. 1121, 1125 (1983); *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). The court must ask "whether there is a 'formal arrest or restraint on freedom of movement' to the degree associated with a formal arrest." *Beheler,* 463 U.S. at 1125 (quoting *Mathiason*, 429 U.S. at 495).

Here, it is undisputed that there was no formal arrest of the defendant. Thus, the court's inquiry is limited to whether, at the time of the interrogation, the defendant was subjected to a restraint on his freedom of movement to the degree associated with a formal arrest. *United States v. Fazio,* 914 F.2d 950,955 (7th Cir. 1990). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318,323 (1994). In other words, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty*, 468 U.S.420,442 (1984); *see also United States v. Salyers,* 160 F.3d 1152, 1159 (7th Cir. 1998) (declining to consider whether defendant's military training made him more likely to believe he was in custody, as "[t]he test is not whether the particular defendant thought he was free to go, but whether a 'reasonable person' in the circumstances would have believed so").

In *Mathiason*, an officer investigating a burglary left his card at the defendant's home, asking the defendant to contact him. The defendant called, and the officer asked him to come to the police station. The defendant went to the station, where the officer took him into an office and shut the door. The officer told the defendant he was not under arrest, but that the officer wanted to talk to him about a burglary. After a few minutes, the defendant confessed. *Mathiason,* 429 U.S. at 493. The

47

Supreme Court held that the defendant was not in custody and thus *Miranda* warnings were not required:

> In the present case, however, there is no indication that the questioning took place in a context where [the defendant's] freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview [the defendant] did in fact leave the police station without hindrance. It is clear from these facts that [the defendant] was not in custody "or otherwise deprived of his freedom of action in any significant way."

*Mathiason,* 429 U.S. at 495.

The Court stated that a "coercive environment," in the absence of restraint on freedom of movement, does not amount to custody:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

*Id*.

In *United States v. Jones,* 21 F.3d 165 (7th Cir. 1994), the Seventh Circuit held that the defendant was not subjected to custodial interrogation. There, the defendant was present in a hotel room when law enforcement conducted a reverse sting. A uniformed officer entered the hotel room with his gun drawn. The defendant was not placed under arrest, however, and another officer told the defendant that although he was not under arrest, he wanted to speak with him. The defendant answered, "all right," and went with the officer in a squad car to the police station. The defendant was questioned in a room with the door closed but unlocked. The defendant was told he was free

48

to leave. During the interview, the defendant made several incriminating statements and consented to the officers' search of several properties. The searches were conducted in the defendant's presence, and after the completion of the searches, the officers dropped the defendant off at his office. The reverse sting had occurred at about 9:00 in the evening; the defendant was dropped off after the searches in the early morning hours of the following day. *Jones,* 21 F.3d at 167. The Seventh Circuit held that these circumstances did not amount to custody: "[The defendant] was not handcuffed or otherwise physically restrained and was told that he was not under arrest . . . and that he was free to leave. There is no evidence that the officers made any threatening gestures or statements, or otherwise engaged in 'strong arm tactics' justifying a belief by [the defendant] that he was in custody." *Id.* at 170; *see also United States v. Scheets,* 188 F.3d 829, 841 (7th Cir. 1999) (discussing *Jones* with approval).

In the end, several factors guide the determination whether a suspect was "in custody" at the time of questioning: whether (1) the encounter occurred in a public place; (2) the suspect consented to speak with the officers; (3) the officers informed the suspect that he was not under arrest and was free to leave; (4) the suspect was moved to another area; (5) there was a threatening presence of several officers and display of weapons or physical force; (6) the officers deprived the suspect of documents he needed to continue on his way; and (7) the officer's tone of voice was such that his requests would likely be obeyed. *See United States v. Wyatt*, 179 F.3d 532, 535 (7th Cir. 1999); *see also Scheets*, 188 F.3d at 836-37. Furthermore, just because a suspect is questioned in a "coercive environment" by law enforcement officers does not necessarily mean that he is "in custody" for *Miranda* purposes. *Wyatt*, 179 F.3d at 535. Rather, the defendant must show that he was "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or

49

actually attained" and that a reasonable person in the defendant's position would not have felt free to leave. *Id.* at 536.

It was undoubtedly uncomfortable for Jefferson, Jr. to be confronted by FBI agents in the early morning hours of September 29, 2004. Indeed, there is nothing quite as personal as attending to one's personal needs after arising from a night of slumber. And to do so in the presence of an FBI agent is certainly the sort of thing that most persons would find quite unnerving. That having been said, the scenario described by both Jefferson, Jr. and Special Agent Vitale to have occurred that morning does not present a picture of Jefferson, Jr.'s having been subjected to custodial interrogation.

At no time was Vitale's firearm displayed. At no time was Jefferson, Jr. told that he was under arrest. At no time was Jefferson, Jr. handcuffed. To be sure, while Jefferson, Jr. may have felt that he was not free to walk away from Vitale (although in fact there was another door leading from the bathroom to the hallway), he likewise was not prevented in any way from going into the bathroom and taking care of his personal needs. Moreover, there were no threats made to Jefferson, Jr. The worst thing that Jefferson, Jr. could say about Vitale's tone of voice was that it was "stern." At the same time, Jefferson, Jr. described Vitale's tone of voice as "professional." In the end, the defendant was, in essence, asked a mere two questions and this took less than two minutes to accomplish.

Simply stated, the evidence shows that on the morning of September 29, 2004, Jefferson. Jr. was not "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *Wyatt,* 179 F.3d at 536. Consequently, there was no need for

50

Vitale to advise Jefferson, Jr. of his constitutional rights prior to asking him if he knew of Irma Martinez's whereabouts. Thus, it is recommended that Jefferson, Jr.'s motion to suppress be denied.

### F. Motion to Dismiss to Counts Two and Three of the Second Superseding Indictment or, in the alternative, to Require the Government to Elect Between Those Two Counts

Defendants Jefferson and Elnora were named as defendants in Counts Two and Three of the second superseding indictment. In Count Two they are charged with a violation of 18 U.S.C. §§ 1589 and 2 in that they

> did knowingly provide and obtain labor and services of a Filipino national, "I.M.," by means of a scheme, plan and pattern intended to cause "I.M." to believe that if she did not perform such labor and services she would suffer serious harm, and physical restraint, and by means of abuse and threatened abuse of law and the legal process.

(Second Superseding Indictment, Count Two.) In Count Three they are charged with a violation of 18 U.S.C. § 1594 in that they

> did attempt to violate section 1589 by providing and obtaining the labor and services of a Filipino national, "I.M.," by threats of serious harm to and physical restraint against "I.M.," by means of a scheme, plan and pattern intended to cause "I.M." to believe that, if she did not perform such labor and services she would suffer serious harm, and physical restraint, and by means of abuse and threatened abuse of law and the legal process.

(Second Superseding Indictment, Count Three.)

The defendants argue that the attempt alleged in Count Three is a lesser included offense of the completed crime alleged in Count Two; that the elements of each offense are identical (in so far as they overlap); and that therefore the counts are multiplicitous.

An indictment is multiplicitous if it charges the same defendant with the same offense in multiple counts. *United States v. Briscoe*, 896 F.2d 1476, 1522 (7th Cir. 1990). "As such, the

51

indictment exposes a defendant to the threat of receiving multiple punishment for the same offense." *Id*. The traditional test of multiplicity determines whether each count requires proof of a fact which the other does not. *United States v. Marquardt*, 786 F.2d, 771, 778 (7th Cir. 1986). "If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity." *Id*.

In response to the defendants' motion the government does not argue that Count Three (the attempt) is not a lesser included offense of Count Two. Nor does the government argue that the two counts are not multiplicitous. Instead, the government argues that neither dismissal of either count nor, alternatively, ordering the government to elect which count on which it wants to proceed to trial, is warranted at this stage of the proceedings. Instead, the government argues that it should be allowed to proceed to trial on both counts, reserving the matter of ensuring the imposition of no multiple sentences until after the return of the jury's verdict. More precisely, the government argues that

> [t]he indictment as charged does not violate the Double Jeopardy Clause because it does not expose the defendants to the threat of receiving multiple punishments for the same offense. *United States v. Briscoe*, 896 F.2d 1476, 1522 (7th Cir. 1990) (citing *United States v. Podell*, 869 F.2d 328, 330 (7th Cir. 1989)). The remedy to alleged multiplicitous counts is not to dismiss the indictment, but to allow the jury to deliberate with the appropriate jury instructions. Even if the jurors would somehow return convictions on both counts, the remedy would then be for the government to dismiss the count that created the multiplicity. *United States v. Galvan*, 949 F.2d 777, 781 (5th Cir. 1991); *see also Podell*, 869 F.2d at 332. The government proposes to remedy the alleged multiplicitous counts by providing an appropriate jury instruction. In *United States v. Bradley*, 390 F.3d 145, 149 (1st Cir. 2004), the grand jury returned a 21-count indictment against the defendant. Counts one through nine consisted of one count of conspiracy to commit forced labor, in violation of 18 U.S.C. §§ 371 and 1589; two counts of forced labor, in violation of 18 U.S.C. § 1589; two counts of attempted forced labor, in violation of 18 U.S.C. § 1594; two counts of trafficking into forced labor, in violation of 18 U.S.C. § 1590; and two counts of document servitude, in violation of 18 U.S.C. § 1592. . . . The jury instruction for

52

attempted forced labor states that the jury should only consider the attempted counts if they have found the defendants not guilty of the substantive counts. This suggestion is no different than Seventh Circuit Pattern Jury Instruction § 2.02. This precautionary jury instruction ensures that the defendants will not be convicted of both the substantive and the lesser offense, thereby guaranteeing that they will not be sentenced to both counts. This proposal eliminates the need, as suggested by the defendants, that the government choose, prior to trial, which count will be presented to the jury. The proposed jury instruction also alleviates the concern that the defendants are being charged with more crimes. The jury instruction allows the jurors to choose between the two crimes, thereby making it clear that one should take precedence over the other.

(Gov't's Resp. at 5-6, dkt. #97.)

In their reply the defendants continue to maintain that requiring the government to elect between Counts Two and Three is the appropriate remedy to cure what the government has conceded to be the multiplicitous nature of the charges set forth in those counts. The defendants argue that to allow the government to proceed on those two admittedly multiplicitous counts would prejudice them in the eyes of the jury by "creating the impression of more criminal activity on [their] part than in fact may have been present," *Marquardt*, 786 F.2d at 778. The defendants also argue that it would give "the government a tactical advantage by increasing the chance of a compromise verdict." (Defs.' Reply at 2, dkt. #98.) Moreover, the defendants argue that "[e]ven without the attempted forced labor charge, the indictment is confusing enough and will present a challenge to the district court in drafting understandable jury instructions." (Defs.' Reply at 2, dkt. #98.)

For example, the *mens rea* element for conspiracy to obtain forced labor and conspiracy to harbor an illegal alien is "knowingly and willfully," for forced labor it is "knowingly," and for harboring an illegal alien it is "knowingly and recklessly." The government thus alleges that the defendants acted willfully and recklessly at the same time.

(Defs.' Reply at 2, dkt. #98.)

53

I am not as concerned as the defendants seem to be that the jury will find it difficult to follow the instructions of the court with respect to the elements of the various offenses set forth in the indictment. To the contrary, it is presumed that the jury will appropriately follow the court's instructions and there is no reason to believe that the jury in this not-particularly- complicated case will be unable to follow the court's instructions. Nevertheless, I am persuaded that the government should be required to elect between proceeding on Count Two or Count Three.

That an indictment is multiplicitous is not fatal and does not require dismissal of the indictment. 1A Charles A. Wright, *Federal Practice and Procedure*, § 145 (3d Ed.). However, where prior to trial the multiplicity of counts is apparent (indeed, in this case it is conceded), requiring the government to elect between counts is certainly within the discretion of the court. *See United States Phillips*, 962 F. Supp. 200, 201 (D.D.C. 1997). In considering whether to order such remedy a court should well consider that "at least some of the harm from multiplicitous prosecution occurs during the course of the trial itself, and not merely at sentencing. *Id*. at 202.

> The law protects an individual against multiplicitous indictments to avoid multiple sentences for a single offense *and to eliminate the prejudice which such indictments may generate in the eyes of a jury*. For when an indictment charges numerous offenses arising from the same conduct it "may falsely suggest to a jury that a defendant has committed not one but several crimes." . . . Compromise verdicts or assumptions that, with so many charges pending the defendant must be guilty on at least some of them, pose significant threats to the proper functioning of the jury system.

*Id*. (citing *United States v. Clarridge*, 811 F. Supp. 697, 702 (D.D.C. 1992)) (emphasis in original).

Simply stated, the government has acknowledged that Counts Two and Three are multiplicitous. Furthermore, the government has not offered any compelling reason why it should not be required to elect which count it wants to proceed on. On the other side of the ledger, these

54

moving defendants are named in multiple counts with "conspiracy to obtain forced labor, forced labor, attempted forced labor, harboring an illegal alien, and conspiracy to harbor an illegal alien – all pertaining to the same alien, with overlapping time frames." (Defs.' Reply at 2, dkt. #98.) Given the number and the array of charges that the government will be presenting to the trial jury as against these moving defendants, it is not unreasonable to require the government to elect between which of the two admittedly multiplicitous counts it would like to present to the jury for its consideration. After all, to require the government to do so would not affect the government's evidentiary presentation at trial. However, requiring the government to elect which of the two counts it would like to proceed on would eliminate any danger of the jury's concluding (solely as a compromise) that the defendants must be guilty of at least one of those two counts.

Thus, and for the foregoing reasons, it will be recommended that the moving defendants' motion to dismiss or, in the alternative, to elect be granted in part and denied in part. Specifically, it will be recommended that the government be required, prior to trial, to elect to prosecute Jefferson and Elnora under either Count Two or Count Three of the Second Superseding Indictment.

**NOW THEREFORE IT IS RECOMMENDED** that the defendants' Motions to Suppress Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 28, 2004 (dkt. #47 & 57) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendants' Motions to Suppress Evidence Seized Pursuant to Execution of a Search Warrant Issued on September 29, 2004 (dkt. #42 & 56) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that Jefferson N. Calimlim's Motion to Suppress

55

Statements (dkt. #45) be **DENIED**;

IT IS FURTHER RECOMMENDED that Jefferson M. Calimlim's Motion to Suppress Statements (dkt. #54) be **DENIED**;

IT IS FURTHER RECOMMENDED that Jefferson N. and Elnora Calimlim's motion to dismiss or, in the alternative, to require the government to elect which count it will proceed on (dkt. #94) be **GRANTED IN PART AND DENIED IN PART**. Specifically, it is recommended that the government be required, prior to trial, to elect to prosecute Jefferson N. and Elnora under either Count Two or Count Three of the Second Superseding Indictment;

NOW THEREFORE IT IS ORDERED that the defendants' Motions to Strike Surplusage (dkt. #43 & 55) be and hereby are **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order or recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation and order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

_____**SO ORDERED** this 4th day of November, 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

56